# Special Government Employee Serving as Paid Consultant to Saudi Company

A special government employee, retained to provide advice on behalf of the Department of Commerce to Middle Eastern countries that are reforming and harmonizing their laws, may accept a paid consulting position with a Saudi energy company without violating the Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, because he does not hold an "Office of Profit or Trust under" the United States.

January 13, 2016

MEMORANDUM OPINION FOR THE
ASSISTANT GENERAL COUNSEL
ADMINISTRATION AND TRANSACTIONS
DEPARTMENT OF COMMERCE

Your Office has asked whether the Emoluments Clause of the Constitution would bar a special government employee of the Department of Commerce ("Department") from accepting a paid consulting position with a Saudi entity known as the King Abdullah City for Atomic and Renewable Energy ("KA-CARE"). *See* Memorandum for Karl Remón Thompson, Acting Assistant Attorney General, Office of Legal Counsel, from Barbara S. Fredericks, Assistant General Counsel for Administration, Department of Commerce, *Re: Applicability of Emoluments Clause to a Special Government Employee* (May 16, 2014) ("Commerce Memo"). The Emoluments Clause forbids anyone "holding any Office of Profit or Trust under" the United States from accepting, without congressional consent, "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. We orally advised your Office that the special government employee in question may accept the consulting position without violating the Emoluments Clause, because, on the facts described to us, he does not hold an "Office of Profit or Trust under" the United States. This memorandum opinion memorializes and further describes the basis for our advice.[1]

---

[1] Because we conclude that the employee in question does not hold an "Office of Profit or Trust under" the United States, we do not address in this memorandum opinion whether KA-CARE is an instrumentality of the Saudi Government, and thus whether the compensation and position the special government employee would receive from KA-CARE

1

## I.

Your Office has explained that one of the Department's special government employees wishes to accept a paid consulting position with KA-CARE.[2] The Department hired the employee as an expert in the Commercial Law Development Program, a division of the Department that "helps achieve U.S. foreign policy goals by providing technical assistance (such as capability building, peer-to-peer best practices awareness, and empowerment of civil society organizations) to developing and post-conflict countries in helping to establish commercial legal reforms." Commerce Memo at 1; *see also About CLDP*, http://cldp.doc.gov/about-cldp (last visited Jan. 11, 2016). The employee, who is both an attorney and a scholar in Sharia law, assists the Commercial Law Development Program in its collaborations with Middle Eastern countries that are reforming and harmonizing their laws. Commerce Memo at 1. His duties are to "revise, update and build capacity to harmonize relevant laws and regulations so that they may help attract responsible international investment to the region," and to "provide legal expertise and advice to countries" in a manner that is sensitive to those countries' cultural norms. *Id.* The employee's assignments have included speaking at colloquia and seminars in the Middle East and reviewing proposed commercial laws for consistency with local customs, cultural sensitivities, and religious norms. Jacobi E-mail. The employee does not have discretionary authority to disburse federal funds or property. Commerce Memo at 1. Nor does he formulate federal policy, supervise other federal employees, or have access to classified materials. *Id.*

The Department hired the special government employee for a one-year term that may, but need not, be renewed, and for duties to be performed on an intermittent rather than full-time basis. *Id.*; *see also* 18 U.S.C.

---

would be an "Emolument [or] Office . . . of any kind whatever, from any King, Prince, or foreign State."

[2] We describe KA-CARE in more detail below. For facts regarding KA-CARE, the Department's Commercial Law Development Program, and the responsibilities of the special government employee at issue, we rely chiefly on information submitted to us by the Department. *See* Commerce Memo; E-mail for Jane Nitze, Attorney-Adviser, Office of Legal Counsel, from Will Jacobi, Senior Attorney, Department of Commerce, *Re: Emoluments question* (Apr. 28, 2014, 8:55 AM) ("Jacobi E-mail").

§ 202(a) (defining "special Government employee" to include "an officer or employee of the executive . . . branch of the United States Government . . . who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis"). He receives assignments from the Commercial Law Development Program, with the length of an assignment generally varying from an hour to several days. Commerce Memo at 1; Jacobi E-mail. The employee is compensated at an hourly rate, files financial disclosure forms, and took an oath of office. Commerce Memo at 1.

KA-CARE was established by Saudi royal decree as an independent legal entity with the "aim of building a sustainable future for Saudi Arabia by developing a substantial alternative energy capacity fully supported by world-class local industries." *The Establishing Order*, https://www.kacare.gov.sa/en/about/Pages/royalorder.aspx (last visited Jan. 11, 2016); *see also* Commerce Memo at 1. The entity is substantially funded by the Saudi Government. Commerce Memo at 1. Its "highest authority" is the "supreme council," composed largely of high-ranking government officials, whose role is to "supervise and undertake the affairs" of KA-CARE and to "take all necessary decisions to achieve the purposes of the City." *Royal Decree Establishing King Abdullah City for Atomic and Renewable Energy* 6 (Feb. 2010) ("*Royal Decree*"), https://www.kacare.gov.sa/en/about/Documents/KACARE_Royal_Decree_english.pdf. Three senior executive officials—a president and two vice presidents—lead KA-CARE's day-to-day activities. *Id.*; *Leadership*, https://www.kacare.gov.sa/en/about/Pages/highmanagement.aspx (last visited Jan. 7, 2016); *see also* Commerce Memo at 1. The three senior executive officials are appointed by royal decree, *see Royal Decree* at 6; Commerce Memo at 1, but are not considered Saudi government officials under Saudi law, Commerce Memo at 1.

## II.

The Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind

whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. As we recently explained, "[t]he Clause was intended to 'preserv[e] foreign Ministers & other officers of the U.S. independent of external influence' by foreign governments." *NOAA Employee's Receipt of the Göteborg Award for Sustainable Development*, 34 Op. O.L.C. 210, 211 (2010) (second alteration in original) (quoting 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966) (notes of James Madison)).

Although the purpose of the Emoluments Clause is broad, "[its] text . . . makes clear that it applies only to a specified class of persons—i.e., those who hold offices of profit or trust under the United States—and not to all positions in the United States government." *Applicability of the Emoluments Clause to Non-Government Members of ACUS (II)*, 34 Op. O.L.C. 181, 185 (2010) ("*ACUS II*"). Our precedents reflect this textual limitation. For example, we have advised that members of the Federal Bureau of Investigation Director's Advisory Board do not hold "Office[s] of Profit or Trust" under the meaning of the Clause, notwithstanding the fact that they are entrusted with access to classified information. *See Application of the Emoluments Clause to a Member of the FBI Director's Advisory Board*, 31 Op. O.L.C. 154 (2007) ("*FBI Advisory Board*"). We likewise have advised that nongovernmental members of the Administrative Conference of the United States ("ACUS") do not hold "Office[s] of Profit or Trust," even though ACUS's "recommendations may 'have had (and were intended to have) a significant effect on the Government's administrative processes.'" *ACUS II*, 34 Op. O.L.C. at 190 (quoting *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 117 (1993) ("*ACUS I*")); *see also Application of the Emoluments Clause to a Member of the President's Council on Bioethics*, 29 Op. O.L.C. 55 (2005) ("*Council on Bioethics*") (concluding that members of the President's Council on Bioethics do not hold offices of profit or trust, even though members advise the President on a range of bioethical issues).

In considering whether individuals hold "Office[s] of Profit or Trust under" the United States for purposes of the Emoluments Clause, we have relied on two different analytic frameworks. In some opinions, we have indicated that only those persons considered "Officers of the United States" for purposes of the Appointments Clause, U.S. Const. art. II,

§ 2, cl. 2, may hold an "Office of Profit or Trust" under the Emoluments Clause, and therefore focused our analysis on whether the relevant individuals were "Officers of the United States." *See, e.g.*, *FBI Advisory Board*, 31 Op. O.L.C. at 156 ("The threshold question . . . in determining whether a member of the Board holds an 'Office of Profit or Trust under [the United States]' is whether a position on the Board is an 'Office under the United States.'" (brackets in original)); *Council on Bioethics*, 29 Op. O.L.C. at 71 ("A position that carried with it no governmental authority (significant or otherwise) would not be an office for purposes of the Appointments Clause, and therefore, under that analysis . . . would not be an office under the Emoluments Clause[.]"); *see also Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986) ("*Part-Time Consultant*") ("Prior opinions of this Office have assumed . . . that the persons covered by the Emoluments Clause were 'officers of the United States' in the sense used in the Appointments Clause."); *Delivery of an Insignia from the German Emperor to a Clerk in the Post-Office Department*, 27 Op. Att'y Gen. 219, 220–21 (1909) (reasoning that a clerk in the Post Office is an inferior officer within the meaning of the Appointments Clause, and so "[i]t follows" that he is subject to the Emoluments Clause).

In other opinions, we have indicated or assumed that the Emoluments Clause may apply to persons who are not "Officers of the United States" under the Appointments Clause, and evaluated individuals' status for Emoluments Clause purposes by considering a set of factors designed to "ensure that concerns about foreign corruption and influence are accounted for." *ACUS II*, 34 Op. O.L.C. at 187; *see, e.g.*, *The Advisory Committee on International Economic Policy*, 20 Op. O.L.C. 123 (1996) ("*IEP*") (concluding that members of a federal advisory committee do not hold offices of profit or trust based on consideration of several factors); *Applicability of Emoluments Clause to "Representative" Members of Advisory Committees*, 21 Op. O.L.C. 176 (1997) ("*Representative Members*") (extending *IEP*'s conclusion to members of a federal advisory committee chosen to present the views of private organizations and interests); *see also Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*, 12 Op. O.L.C. 67, 68 (1988) ("*Authority of Foreign Law Enforcement Agents*") ("[T]he Clause applies to all persons holding

an office of profit or trust under the United States, and not merely to that smaller group of persons who are deemed to be 'officers of the United States' for purposes of Article II, Section 2 of the Constitution."); *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 157 (1982) ("It is not clear . . . that the words 'any Office of Profit or Trust,' as used in the Emoluments Clause, should be limited to persons considered 'Officers' under the Appointments Clause. Both the language and the purpose of the two provisions are significantly different."). *See generally ACUS II*, 34 Op. O.L.C. at 184–87 (describing approaches historically adopted by our Office in defining the reach of the Emoluments Clause).[3]

Most recently, we declined to definitively pick one approach over the other when doing so was not necessary to resolve the question presented. In evaluating whether nongovernmental members of the Administrative Conference of the United States held "Office[s] of Profit or Trust" under the Emoluments Clause, we noted that such members would "plainly" not hold such offices under the first approach, "given the purely advisory functions of ACUS." *Id.* at 187. But we further explained that we did not "need" to "rest our decision on that ground," because nongovernmental members of ACUS "cannot be deemed to hold the kind of office to which the Emoluments Clause applies" even under the alternative multi-factor test. *Id.* We thus concluded that such persons were not covered by the Emoluments Clause, "even assuming that the Clause may apply in some instances to persons who do not hold an office under the Appointments Clause." *Id.* at 192.

We will follow the same approach here: we will not decide whether an "Office of Profit or Trust" for purposes of the Emoluments Clause must also be an "Office" for purposes of the Appointments Clause, or whether an "Office of Profit or Trust" is a broader category defined by a range of relevant factors, because under either approach, the special government

---

[3] The reach of the Emoluments Clause under this second approach, as well as the set of factors our Office has considered significant, have varied over time. *Compare, e.g.*, *ACUS II*, 34 Op. O.L.C. at 187–92 (concluding under range of factors that nongovernmental members of ACUS *do not* hold offices of profit or trust), *with ACUS I*, 17 Op. O.L.C. at 117 (concluding under range of factors that nongovernmental members of ACUS *do* hold offices of profit or trust).

employee at issue here does not occupy an "Office of Profit or Trust under" the United States.

## A.

We explain first why the special government employee at issue would not be an "Officer[] of the United States" for purposes of the Appointments Clause. As an initial matter, the special government employee does not appear to exercise "delegated sovereign authority" of the United States, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007) ("*Officers of the United States*"), or to exercise "*significant authority* pursuant to the laws of the United States," *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 143 (1996) ("*Separation of Powers*") (quoting and adding emphasis to *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)). He does not have authority to "administer, execute, or interpret the law," *Officers of the United States*, 31 Op. O.L.C. at 87; *see also Separation of Powers*, 20 Op. O.L.C. at 144 (members of a commission with purely advisory functions are not officers of the United States "because they 'possess no enforcement authority or power to bind the Government'" (quoting *Proposed Commission on Deregulation of International Ocean Shipping*, 7 Op. O.L.C. 202, 202–03 (1983))); to "issue regulations and authoritative legal opinions on behalf of the government," *Officers of the United States*, 31 Op. O.L.C. at 88; *see also Separation of Powers*, 20 Op. O.L.C. at 144 n.55 (discussing significance of judges' authority to issue final decisions); or to "receive and oversee the public's funds," *Officers of the United States*, 31 Op. O.L.C. at 90. Nor does he possess diplomatic authority, except in the very diffuse sense of performing consultative functions that may advance U.S. foreign policy goals. *Compare id.* at 91–92 (diplomatic offices have the "authority to speak and act on behalf of the United States toward or in other nations," in particular by exercising the delegated authority of the President to "'negotiate[] and sign[] a treaty'" (alterations in original) (quoting *Ambassadors and Other Public Ministers of the United States*, 7 Op. Att'y Gen. 186, 212 (1855))). As long as the special government employee is not engaged in actual negotiations with other countries, we do not believe the advice he might provide about how countries can attract international

investment or harmonize proposed legal reforms with their cultural and religious norms would qualify as the exercise of "delegated sovereign authority" or "significant authority" for Appointments Clause purposes.

Further, the special government employee does not appear to hold the essential features of a federal office—in particular, "tenure," "duration," and "continuous duties." *See Separation of Powers*, 20 Op. O.L.C. at 141–42 (quoting *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890)); *accord United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868) (duties of an officer are "continuing and permanent, not occasional or temporary"); *Officers of the United States*, 31 Op. O.L.C. at 100 ("The second element of a federal 'office,' necessary to make a position subject to the Appointments Clause, is that the position be 'continuing'"—not "personal, 'transient,' or 'incidental.'"). He serves under a one-year contract and receives assignments from the Commercial Law Development Program on a case-by-case basis; his duties, hours, and compensation are thus not continuing and permanent but depend entirely on a supervisory determination that his services are needed in a particular case. Put differently, "[h]e is an expert, selected as such. . . . He is selected for the special case. He has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case." *Auffmordt*, 137 U.S. at 326–27 (deeming a merchant appraiser not to be a federal officer); *see also United States v. Germaine*, 99 U.S. (9 Otto) 508, 512 (1878) (deeming a surgeon not to be a federal officer because he was "only to act when called on by the Commissioner of Pensions in some special case"). The employee does receive an emolument from the federal government in the form of an hourly wage, but not a "continuing emolument," *see Auffmordt*, 137 U.S. at 327, in the form of a government salary or guaranteed work flow, and this Office has not treated receipt of such an emolument as a feature that, by itself, would render an individual an officer for Appointments Clause purposes, *see Officers of the United States*, 31 Op. O.L.C. at 120–21 ("In cases holding that temporary positions were not offices, courts have remarked that the pay provided was per diem or otherwise based on the amount of work done, rather than involving a salary."). Accordingly, we do not believe the special government employee is an "Officer[] of the United States" for purposes of the Appointments Clause. He therefore would not occupy an "Office of Profit or Trust" under our Office's precedents that hold that

only persons considered "Officers of the United States" under the Appointments Clause may hold "Office[s] of Profit or Trust" under the Emoluments Clause.

## B.

We also believe that the special government employee at issue does not hold an "Office of Profit or Trust" for purposes of the Emoluments Clause under the approach that considers a range of factors. As noted above, the factors our Office has considered in assessing the reach of the Emoluments Clause under this approach are directed at ensuring that the "concerns about foreign corruption and influence [that underlie the Clause] are accounted for." *ACUS II*, 34 Op. O.L.C. at 187; *see also Authority of Foreign Law Enforcement Agents*, 12 Op. O.L.C. at 68 ("Th[e] [C]lause, adopted unanimously at the Constitutional Convention of 1787, was intended by the Framers to preserve the independence of officers of the United States from corruption and foreign influence. [It] must be read broadly in order to fulfill that purpose. Accordingly, the Clause applies to all persons holding an office of profit or trust under the United States, and not merely to that smaller group of persons who are deemed to be 'officers of the United States' for purposes of Article II, Section 2 of the Constitution."). Factors our Office has previously considered include whether an individual exercises "the type of discretion and authority that inheres in an office of profit or trust,"[4] whether he supervises other federal employees,[5] whether his duties are continuing and permanent,[6] and whether

---

[4] *ACUS II*, 34 Op. O.L.C. at 189; *see also IEP*, 20 Op. O.L.C. at 123 (considering whether a committee is "purely advisory" or "discharges . . . substantive statutory responsibilities" in assessing status of its members for purposes of the Emoluments Clause); *cf. Part-Time Consultant*, 10 Op. O.L.C. at 99 (concluding that a part-time consultant for the Nuclear Regulatory Commission was subject to the Clause in part because the Commission considered renewal of his contract "essential to the conduct of the agency's mission").

[5] *See ACUS II*, 34 Op. O.L.C. at 189 (noting that nongovernmental members of ACUS do not "exercise the type of supervisory power or decisional authority that would potentially be relevant to a conclusion that they are subject to the Emoluments Clause"); *cf. FBI Advisory Board*, 31 Op. O.L.C. at 154 (board members who "exercise no supervisory responsibilities over other persons or employees as a result of their positions" are not subject to the Clause).

he receives an emolument from the federal government.[7] We have also looked to whether an individual has a security clearance or access to classified information,[8] whether he is subject to federal conflict of interest statutes and regulations,[9] and whether he takes an oath of office,[10] although our recent advice indicates that these latter factors are less weighty than the former.[11] No single one of these factors has proven determinative; rather, we have considered them in combination to assess whether a person is subject to the Clause.

We believe that the special government employee at issue here does not hold an "Office of Profit or Trust" when the relevant factors are considered in their totality. As an initial matter, the special government employ-

---

[6] See IEP, 20 Op. O.L.C. at 123 (members of a committee do not hold an "Office of Profit or Trust" in part because they "meet only occasionally"); Field Assistant on the Geological Survey—Acceptance of an Order from the King of Sweden, 28 Op. Att'y Gen. 598, 599 (1911) ("Field Assistant") (field assistant is outside the scope of the Clause in part because his duties do not require "continuous service," but rather "[o]nly occasional work").

[7] See ACUS II, 34 Op. O.L.C. at 187 (noting that nongovernmental members of ACUS "serve without compensation"); IEP, 20 Op. O.L.C. at 123 ("The members of the IEP Advisory Committee . . . serve without compensation.").

[8] See ACUS II, 34 Op. O.L.C. at 188 (pointing to lack of access to classified information as a relevant factor); IEP, 20 Op. O.L.C. at 123 (same); Part-Time Consultant, 10 Op. O.L.C. at 99 (pointing to a consultant's security clearance and potential access to sensitive or classified information in concluding that he is subject to the Clause).

[9] See ACUS I, 17 Op. O.L.C. at 117 (nongovernmental members of ACUS are subject to the Emoluments Clause in part because they are special government employees subject to federal conflict of interest laws); Part-Time Consultant, 10 Op. O.L.C. at 99 (a part-time consultant is subject to the Clause in part because he must conform to agency regulations regarding conflicts of interest and must "report . . . any change in his private employment or financial interests").

[10] See IEP, 20 Op. O.L.C. at 123 (pointing to oath of office as a relevant factor); Part-Time Consultant, 10 Op. O.L.C. at 99 (same).

[11] See ACUS II, 34 Op. O.L.C. at 188 (fact that nongovernmental members of an advisory board are special government employees subject to federal conflict of interest laws is "far from determinative" (citing IEP, 20 Op. O.L.C. at 123; Representative Members, 21 Op. O.L.C. at 177)); id. at 189 (taking an oath of office is, "for purposes of analyzing purely advisory bodies, . . . not particularly weighty"); cf. FBI Advisory Board, 31 Op. O.L.C. at 156–60 (members of FBI Director's Advisory Board, who have access to classified information and are obligated not to disclose it but do not have authority to originate, modify, or declassify classified information, do not hold "Office[s] of Profit or Trust").

ee does not, in our view, exercise "the type of discretion and authority that inheres in an office of profit or trust." *ACUS II*, 34 Op. O.L.C. at 189. His role is to assist the Commercial Law Development Program in its collaborations with Middle Eastern countries. Although that role may require him to offer his expert advice on how to attract international investment or harmonize proposed legal reforms with cultural and religious norms, it does not authorize him to formulate federal policy or to exercise diplomatic authority (i.e., to speak on behalf of or to represent the United States in international negotiations). Nor does it authorize him to exercise supervisory authority over other federal employees or to direct the disbursement of federal funds or property. *See id.* (although members of ACUS have authority over certain decisions of the Chairman, "[i]n light of ACUS's purely advisory function as well as its governance structure," pursuant to which nongovernmental members are likely to constitute a minority, "we do not believe its nongovernmental members exercise the type of supervisory power or decisional authority that would potentially be relevant to a conclusion that they are subject to the Emoluments Clause"). The special government employee, moreover, has no access to classified information. Commerce Memo at 1.

The special government employee also lacks the continuing and permanent duties that we have found to be a common feature of an office of profit or trust under the Emoluments Clause. *See, e.g.*, *ACUS II*, 34 Op. O.L.C. at 187 (nongovernmental members of ACUS are not subject to the Clause in part because they meet "only on an occasional basis"). He serves under a one-year contract, with duties performed on an intermittent basis upon assignment by the Commercial Law Development Program; his service, in short, is temporary and requires "[o]nly occasional work." *Field Assistant*, 28 Op. Att'y Gen. at 599. [12]

It is true that the special government employee is compensated for his services, took an oath of office, and files financial disclosure forms—

---

[12] To be clear, classification as a "special government employee" "without more . . . does not exempt [an individual] from the constitutional prohibition in the Emoluments Clause." *Part-Time Consultant*, 10 Op. O.L.C. at 99. Neither does it necessarily subject the individual to the obligations of the Emoluments Clause. *ACUS II*, 34 Op. O.L.C. at 188. In this case, the limited duration of the employee's position and the absence of continuous duties are factors that suggest that he does not hold an "Office of Profit or Trust."

factors our Office has indicated may be relevant in marking the bounds of the Emoluments Clause. But the presence of those factors here does not, in our view, make the employee's position an office of profit or trust. The receipt of compensation has not proven a dispositive factor, particularly where, as here, compensation is paid on an hourly or daily basis for services actually performed. *See id.* (field assistant does not hold an "Office of Profit or Trust" where, among other factors, he "is paid by the day when actually employed" and his annual compensation is capped). And while being entrusted with a position that requires taking an oath of office and filing financial disclosure forms may weigh in favor of finding that an office is covered by the Emoluments Clause, those factors are not particularly weighty, *see supra* note 11, and, in any event, do not alter our conclusion here in light of the limited discretion and authority the employee exercises, and the occasional and temporary nature of his duties, *see ACUS II*, 34 Op. O.L.C. at 188–89 (nongovernmental members of ACUS are not subject to the Emoluments Clause even though they traditionally have taken oaths of office and are special government employees subject to federal conflict of interest statutes and regulations).

### III.

For the foregoing reasons, we conclude that the special government employee in question does not hold an "Office of Profit or Trust" within the meaning of the Emoluments Clause. We therefore believe that the Emoluments Clause would not bar him from accepting a paid consulting position with KA-CARE, regardless of whether doing so would constitute acceptance of an "Emolument [or] Office . . . of any kind whatever, from any King, Prince, or foreign State."

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
